

AO 91 (REV.5/85) Criminal Complaint

SAUSA William Novak (312) 697-4073

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**

AUG – 2 2013

Aug 2 2013

THOMAS G BRUTON
CLERK, U S DISTRICT COURT

UNITED STATES OF AMERICA

v.

THOMAS JACKSON,
       also known as "Tuck";
CALVIN WILLIAMS, Jr.,
       also known as "Mack";
DEMETRIUS WROTTEN;
and NOLAN SWAIN

**CRIMINAL COMPLAINT**

CASE NUMBER:

**13 CR 636**

**MAGISTRATE JUDGE KEYS**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: From on or about June 22, 2013, to on or about August 1, 2013, at Chicago, in the Northern District of Illinois, Eastern Division, THOMAS JACKSON, also known as "Tuck", CALVIN WILLIAMS, Jr., also known as "Mack", DEMETRIUS WROTTEN, and NOLAN SWAIN, defendants herein:

> did conspire with each other and with others, to knowingly and intentionally possess with intent to distribute a controlled substance, namely, five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1);

in violation of Title 21, United States Code, Section 846. I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
ERIC DORNBUSH
Special Agent, Bureau of Alcohol, Tobacco, Firearms &
Explosives

Sworn to before me and subscribed in my presence,

August 2, 2013            at      Chicago, Illinois
Date                                      City and State

ARLANDER KEYS, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

UNITED STATES DISTRICT COURT     )
                                       )     ss

NORTHERN DISTRICT OF ILLINOIS     )

## AFFIDAVIT

## I.    INTRODUCTION

I, Eric Dornbusch, being duly sworn, state as follows:

1.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since December 2009. My duties include investigating violent crimes, narcotics trafficking offenses, and the possession, use, and sale of firearms.

2.    During my employment as an ATF Special Agent, I have personally conducted or assisted in hundreds of criminal investigations. Those investigations have employed a variety of investigative techniques, including but not limited to the following: (a) physical surveillance; (b) debriefing of defendants, witnesses, informants, and other individuals who have knowledge concerning violations of federal firearms laws; (c) undercover operations; (d) execution of search warrants; (e) consensual monitoring and recording of conversations; (f) electronic surveillance through the use of pen registers and trap and trace devices; and (g) handling and maintenance of evidence.

3.    This affidavit is submitted in support of a criminal complaint alleging that there is probable cause that Thomas JACKSON, also known as "Tuck", Calvin WILLIAMS Jr., also known as "Mack", Demetrius WROTTEN,  and Nolan SWAIN (collectively, the "defendants"), did conspire with each other and with others, to knowingly and intentionally possess with intent to distribute a controlled substance, namely, five kilograms or more of a mixture and substance

containing a detectable amount of cocaine, a Schedule Controlled Substance, in violation of Title 21, United States Code, Section 846.

4.     Because this affidavit is being submitted for the limited purposes of establishing probable cause in support of a criminal complaint charging defendants with conspiracy to possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 846, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

5.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, including an undercover agent, law enforcement records, information provided by a confidential informant, and my review of consensually recorded conversations and meetings.

6.     The investigation included the use of consensually recorded telephone calls and audio and video recorded meetings. The summaries of recorded conversations in this affidavit do not include reference to all the topics covered during the conversations. Further, quoted material from the recorded conversations as set out in this affidavit is taken from draft summaries, not final transcripts. In addition, the summaries of recorded conversations in this affidavit do not include references to all statements made by the speakers on the topics that are described by the speakers. In many of the paragraphs describing calls and meeting set forth below, interpretations of the discussion are included in brackets. These interpretations include meanings attributed to code words, coded language, or vague references used by the speakers. My understanding and interpretation of the conversations is based upon the content of the

conversations, information provided by the confidential source and an undercover agent present for the meetings, the context of other recorded conversations, my knowledge derived from this investigation, and my experience and training, and the experience and training of other law enforcement agents, with whom I have consulted.

## II.  FACTS ESTABLISHING PROBABLE CAUSE

### A.  *Information Provided by the Confidential Informant*

7.     The investigation was initiated in part on the basis of information provided by an ATF confidential informant ("the CI") who has a prior criminal history which include a robbery conviction. The CI has provided information to the ATF since approximately October 2012 and has previously provided information to the Chicago Police Department and the FBI. Information provided by the CI has proven reliable and has led to arrests and the seizure of evidence. The CI is providing assistance in exchange for financial compensation. He has been paid by the ATF in the past and expects to continue to be paid by the ATF.

8.     On June 26, 2013[1], the CI provided the ATF with information which indicated that two individuals named THOMAS JACKSON and CALVIN WILLIAMS, Jr. had performed armed robberies in the past and were interested in performing future armed robberies. Specifically, the CI informed the ATF that on June 22, CI had met with JACKSON and WILLAMS. During the CI's conversation with the two men, JACKSON told CI that he had access to firearms, including "AKs and MAC-10's," and knew of other individuals interested in performing robberies along with him and WILLIAMS. The CI also informed the ATF that JACKSON uses the nickname "Tuck" and WILLIAMS uses the nickname "Mack."

---

1 All dates are for the year 2013 unless otherwise mentioned.

9. On June 26, the CI positively identified JACKSON from an unlabeled Chicago Police Department ("CPD") booking photograph. On July 3, the CI positively identified WILLIAMS from an unlabeled Illinois Secretary of State photograph.

B. *June 26 to July 8 Telephone Conversations Between the CI and Jackson and Williams.*

10. Between June 26 and July 8, CI, JACKSON, and WILLIAMS engaged in numerous consensually recorded conversations to set up a meeting between JACKSON, WILLIAMS, and an Undercover ATF Agent ("the UCA") to discuss the home invasion robbery. The UCA was posing as a drug courier who transported kilograms of cocaine for a Mexican cartel and was unhappy with his/her employer. A meeting was initially scheduled for July 2 but JACKSON and WILLIAMS were unable to attend. Your affiant was present during a July 2, consensually recorded conversation between JACKSON and the CI and heard JACKSON request that the meeting be rescheduled for the next day, July 3. JACKSON informed the CI that he was out of town. JACKSON also told the CI that he would bring "the moves" with him to the July 3 meeting. According to the CI, "moves" is a street-term for firearms.

11. The next day, July 3, JACKSON and WILLIAMS failed to meet with the CI at the appointed time. At approximately 7:00 p.m., the CI spoke with WILLIAMS, during a consensually recorded phone call. During the conversation, WILLIAMS expressed disappointment with JACKSON for missing the meeting. WILLIAMS informed the CI that he and JACKSON were prepared to reschedule the meeting.

12. Between that call on July 3 and July 8, the CI had numerous consensually recorded calls with both JACKSON and WILLIAMS. During these calls both JACKSON and WILLIAMS expressed interest in meeting with the UCA to plan a robbery. As a result of these calls, a meeting between JACKSON, WILLIAMS, the CI, and the UCA was scheduled for July

9.

C.     *The July 9 Meeting Between Jackson, Williams, the CI, and the UCA.*

13.     On July 9, at approximately 1:47 p.m., the UCA was stationed at the Undercover Meet Location ("the UML"). The UML was equipped with audio and video recording equipment, which, in addition to the recording device used by the UCA, captured the conversations in the UML. The UCA observed silver Chevrolet Caviler drive into the UML. The UCA observed that this vehicle was driven by a black male in his thirties with a black male passenger, also in his thirties with a birthmark near his eyes and a bump on his head. Prior to this undercover contact, the UCA had viewed several photographs of JACKSON and WILLIAMS. The UCA was able to identify the black male driver as JACKSON and the black male passenger with the birthmark and bump as WILLIAMS. The CI, who parked in the alley, also entered the UML. The CI introduced JACKSON and WILLIAMS to the UCA as "Tuck" and "Mack," respectively.

14.     The UCA led the CI, JACKSON, and WILLIAMS into a back meeting room where the men discussed the proposed robbery. The UCA stated that he had a serious plan and didn't want any "scrubs." JACKSON replied "I already know." The UCA advised that no matter what happened the guys he was going to set up could never know that he had set them up. JACKSON agreed, and WILLIAMS responded, "They won't, or that trail will come back to you." The UCA stated that there would be only one shot at the robbery. JACKSON replied, "failure is not an option."

15.     At this point, the UCA informed JACKSON and WILLIAMS, in substance, that the UCA was a drug courier who moved kilograms of cocaine from a stash house to customers for a Mexican drug supplier. The UCA informed JACKSON and WILLIAMS that when the

UCA picked up his/her allotted kilograms of cocaine from the stash house the UCA usually saw at least 20 kilograms of cocaine. Further, the UCA advised that the two men who always guarded the stash house always had firearms to protect the cocaine from any robbery attempts. The UCA advised that s/he was looking for a crew to rob the stash house but didn't want the supplier to know who set him up.

16.     JACKSON asked, "Are there a lot of them?" and WILLIAMS asked if there was one gun. The UCA told JACKSON and WILLIAMS that there were two men and each had a firearm. JACKSON asked, "We know the location where we going?" The UCA responded that the location of the stash house changed with each shipment and that the UCA did not know ahead of time where the cocaine would be kept. JACKSON asked if the armed guards ever came out of the stash house. The UCA answered that s/he had never known the men to leave the house when they were guarding the cocaine. The UCA told JACKSON and WILLIAMS that they were going to need firearms to conduct the robbery. JACKSON advised, "We got plenty of that, you know what I'm saying?"

17.     The UCA, JACKSON, and WILLIAMS then discussed the split of the robbery proceeds. The UCA informed the men that there were going to be twenty kilograms of cocaine in the stash house, and that the UCA wanted three kilograms of cocaine.

18.     The UCA warned JACKSON and WILLIAMS that the armed guards were not going to let the men take the cocaine without a fight. JACKSON responded, "Ain't no give. Walk in, ain't no talkin'. Come in there, smack a motherfucker. I don't want to talk." WILLIAMS responded, "I guarantee it's all gonna go down nice." The UCA told the men that s/he had never done this before and asked if the supplier would ever figure out s/he set up the supplier. JACKSON responded that they had done this type of robbery before.

19.     JACKSON and WILLIAMS then discussed how they would follow the UCA. WILLIAMS expressed disappointment in having to follow the UCA to the stash house preferring to be able to enter the stash house without the UCA present. JACKSON agreed that they needed to follow the UCA. JACKSON stated,

> We got all the shit we need.  Once we get in.  Once we in the door, we got ties, we gonna tie everyone up.  No motherfucker gonna move.  Once we in, ain't nobody gonna leave until whoever comes and lets 'em go, you hear me?  'Cause that's the thing we worry about, we don't need no motherfucker chasing us with no bunch of drugs—you know what I am saying?  So we gonna bring our ties, we gonna bring our ties, tie them legs and all.

WILLIAMS continued, "And see, once we get control of the situation, we gotta get all the weapons and drugs up outta there."  JACKSON replied, "Exactly, we taking their guns." WILLIAMS explained, "We gotta strip them of they guns, we want all their shit, secure the merch, get it outta there, and then we'll be up outta there."  JACKSON agreed, saying, "get up outta there, hit the e-way."  JACKSON and WILLIAMS agreed that they would need to tie up the UCA as well.

20.     The UCA asked JACKSON and WILLIAMS how many guys they planned on bringing to the robbery.  WILLIAMS suggested that the men needed to be "on point," telling the UCA that they needed four men.  JACKSON stated, "'Cause we gonna have four niggas with us; we gonna have four bangers (guns)."  WILLIAMS responded, "they have one gun, maybe two on them... We gonna have to show them the firepower.  They got a couple of handguns, but if we come in with them things (guns), like the SWAT team, shit, they know."

21.     The UCA informed JACKSON and WILLIAMS that he wanted to meet the other crew members because he didn't want the other men to not recognize him and accidentally shoot him.  JACKSON responded, "No problem, G.  You blessed you fuckin' with us....the smoother this is, no noise, we trying to get this shit and get up outta here.  Like I said, we gonna bring our

7

ties, we don't need no motherfucker running off the porch and shooting up the street causing a scene. None of that shit. No motherfucker's gonna move until they come and let 'em go."

22.     The UCA cautioned JACKSON and WILLIAMS about the armed guards at the stash house, saying that they are very strong men as well as being armed with firearms. WILLIAMS responded, "Probably gonna have to shoot somebody anyways, 'cause I ain't playing around them strong motherfuckers."

23.     The UCA and JACKSON then exchanged numbers and JACKSON provided his number as (773) 251-3968 ("Phone 1"). JACKSON then advised, "I'm fittin' to shoot outta town tomorrow. I was really staying in town to talk to you. Gotta go out of town tonight take care of business." The UCA, JACKSON, and WILLIAMS agreed to keep in touch and meet again with the additional crew members when JACKSON was back in town. WILLIAMS suggested that they might need bulletproof vests, saying, "We might have to just storm that bitch; we might have to Desert Storm that boy."

24.     At this point, the UCA, JACKSON, WILLIAMS and the CI returned to the larger warehouse area and JACKSON and WILLIAMS browsed through the clothing and accessories, purchasing boots and a basketball jersey, respectively. After making their purchases, WILLIAMS asked, "You can't get none of that shit, that police gear shit?" The UCA asked what kinds of clothing WILLIAMS was looking for. WILLIAMS responded,

> The whole giddy-up. You know what them people come with. The mask, the vest…'Cause that surprise, when motherfuckers see. You know if a nigger thinks it's just some motherfuckers coming; they quick to wanna up their poles. We give them police, they don't know. You get that one minute."

The UCA advised that he would try to find police gear but did not know where to look for that type of clothing.

25.     At approximately 2:30 p.m., the meeting ended and the UCA observed

8

JACKSON, WILLIAMS, and the CI leave the UML.

D.     *The Subsequent Phone Calls From July 9 to July 24 Between Jackson, the CI, and the UCA Regarding a Second Meeting*

26.     Between July 9, 2013, and July 24, 2013, JACKSON, the CI, and the UCA engaged in numerous consensually recorded phone calls to attempt to set up a second meeting between UCA and JACKSON and WILLIAMS, along with any additional participants in the planned robbery. During a consensually recorded call between the CI and JACKSON on July 17, a meeting was initially scheduled for July 18. As described in more detail below, during a consensually recorded call between the CI and JACKSON on July 18, this meeting was rescheduled for July 19. The July 19 meeting did not occur, however, JACKSON continued to speak with the CI and the UCA via telephone and express interest in the robbery. A representative selection of the phone calls between JACKSON and either the CI or the UCA to set up a second meeting is discussed below.

27.     On July 18, at approximately 6:16 p.m., the CI placed a consensually recorded telephone call to JACKSON to discuss their scheduled meeting that day. During the conversation, JACKSON stated,

> We need a couple more gangsters. We need two more gangsters, my man suppose to be getting some. We wanna to go in there with some heavy artillery, we don't want to get nobody killed or nothing, you know? So that is why I was just making sure we got all the right shit. We got majority of everything man, just missing two [unintelligible], but my buddy said he would be here later this evening. That's why I was trying to call [the UCA], but I don't even got his number.

The CI informed JACKSON that s/he would wait for JACKSON to accompany him/her to the meeting with the UCA.

28.     Thirty minutes later, at approximately 6:42 p.m., JACKSON sent CI a text message and informed CI that he would not be attending the meeting. JACKSON also informed

CI that he would call CI later that day.

29.     One hour later, at approximately 7:40 p.m., the CI placed a consensually recorded phone call to JACKSON. During the conversation, the CI told JACKSON the meeting was rescheduled for the next afternoon at 1:30 p.m.. The CI also informed JACKSON that the UCA was upset that JACKSON did not make the meeting. JACKSON stated, "Yeah, you know how this shit be man, them guys man, you know? They still taking care of their little business or whatever man. I told them niggas to be ready, but I holla'd at them already."

30.     The next day, July 19, at approximately 2.42 p.m., the UCA placed a consensually recorded phone call to JACKSON to determine why he was over an hour late for their re-scheduled meeting. JACKSON informed the UCA that he was approaching Joliet in his vehicle. The UCA suggested that the meeting be postponed for another week and also warned JACKSON that neither he nor his crew could be late on the day of the robbery. JACKSON responded, "I swear to god I'll be ready, have everything ready…call [CI] right now and let him know what is going on so that he won't think I'm on no bullshit. I'm not leaving town period. I be waiting on you; I ain't going nowhere."

31.     On July 23, at approximately 3:08 p.m., the UCA placed a consensually recorded phone call to JACKSON. During the conversation, the UCA asked JACKSON if he wanted to meet the UCA. The two agreed to meeting on July 24. The UCA then asked if JACKSON was going to stay in town. JACKSON responded, "Yeah, I'm here, that's why I ain't left yet. I ain't going nowhere until I talk to you and we figure, do what we got to do." The UCA then asked JACKSON if he really needed additionally crew members for the robbery. JACKSON responded, "Probably another one, just for extra security. Probably one more guy, at least one more guy just in case there be a motherfucker in a car." The UCA reminded JACKSON that the

time was nearing for the robbery and they had to be ready to act. JACKSON responded, "Hell yeah! We got to do this shit – I need it."

E.    *The July 24 Meeting Between JACKSON, WROTTEN, the CI, and THE UCA*

32.    On July 24, the UCA and the CI met with JACKSON, as well as DEMETRIUS WROTTEN at a fast food restaurant on 76th and Vincennes in Chicago. The UCA was wearing both a video and audio recording device and driving an undercover vehicle which also had video and audio recording capability. At approximately 3:08 p.m., the UCA and the CI observed a black BMW sedan ("Vehicle 2") enter the restaurant's parking lot. The UCA observed that Vehicle #2 circled the parking lot before parking next to the undercover vehicle. The UCA and the CI exited the undercover vehicle and observed JACKSON and a black male, later identified as DEMETRIUS WROTTEN, exit Vehicle 2. The UCA observed that JACKSON was driving Vehicle 2.

33.    The UCA and the CI greeted JACKSON and WROTTEN, and JACKSON introduced the CI and the UCA to WROTTEN as "his guy." JACKSON then asked "What's the word guys?" The UCA advised that the cocaine supplier would be calling him shortly and that the pick-up would be in the next week. The UCA asked JACKSON if he was sure he wanted to do the robbery. JACKSON replied, "Hell yeah, I'm ready. Like I was just telling you, no bullshit. I'm not going nowhere until you call me...two buddies are acting scary, 'these are the cops; they're the police.' Fuck 'em, we don't need them. Me, my buddy (WROTTEN), and Mack (WILLIAMS) are gonna take care of it."

34.    At approximately 3:11 p.m., the UCA suggested that they sit inside the undercover vehicle, at which point JACKSON entered the rear driver's side passenger seat behind the UCA and WROTTEN got into the passenger's side rear seat behind the CI. The UCA

then told the men that the supplier would be ready the next week on Tuesday, Wednesday or Thursday. JACKSON replied, "That's all we need, just three." The UCA asked how they were intending to rob the stash house because UCA had noticed that the two armed guards who guarded the stash house always looked at him "hard" when he came to the house. JACKSON asked, "They comfortable when you sit down?" The UCA indicated that they were and told JACKSON and WROTTEN that the house was always guarded by two men armed with firearms as the UCA always saw twenty kilograms of cocaine in addition to the kilograms of cocaine that he picked up. The UCA also told JACKSON and WROTTEN that the UCA needed the robbery crew to be near him when the call came from the supplier as the supplier expected the UCA to make the pick-up in a short amount of time.

35.     JACKSON replied, "We gotta go straight there, I'm not going out of town. When you call me I got to come straight to you 'cause you already told us." The UCA suggested that JACKSON and his crew hang out with The UCA before robbery was to take place so they could be off the street and be ready for the call. The UCA advised that he had a television and drinks so they could entertain themselves as they waited. WROTTEN stated, "We could sit in a room. We don't need nothing, man. We there to take care of business. I don't need anything."

36.     The UCA then advised that he couldn't just take the kilograms of cocaine he was supposed to pick-up and steal those as this would lead the supplier to think that the UCA had set up the robbery. JACKSON agreed, saying "You want to have it where like, godamnit, his people, can see too what the fuck is going on, witnesses." The UCA agreed, and JACKSON continued, "What I was thinking, right. What you was telling me you went in, got your order, going out the door, talking shit—'I'll holler at you later'—whatever. I was thinking as you coming out a motherfucker grab you." The UCA asked if that person would push the UCA back

12

into the house and JACKSON said "No, 'cause you really don't want these guys to shoot at you." WROTTEN added, "You gonna have to get slapped with the move." JACKSON stated, "We ain't gonna really hurt you, we gonna make it look good. 'Cause you don't really want these guys—you don't know if these niggas (armed stash house guards) will shoot. I don't want to put you in the middle of, and a nigga get to blowing and you right there." The UCA agreed that he didn't want to be stuck in the crossfire of the robbery crew and the stash house armed guards. JACKSON continued, "So I was thinking, maybe we could like as you coming out of that bitch, smack you across your shit, grab you, my man pull you outside, they rush in, then bring you back in; 'Bitch, where are you going, get back here.' We gonna tie everyone ass up, get the moves (firearms) and be gone."

37.     The UCA told JACKSON that s/he liked this plan, and reminded the men that the two stash house guards were always armed with handguns and sometimes displayed these guns by having them tucked in their waistband or laying out on a chair. JACKSON responded, "That would be perfect if they got them bitches on the chair—'cause we coming to take 'em." The UCA reminded JACKSON that he wanted three kilograms of cocaine as payment for setting up the robbery. JACKSON agreed and the UCA told JACKSON and WROTTEN that they would get the remaining twenty or so kilograms of cocaine and the guard's guns.

38.     The men then discussed who would be conducting the robbery, and JACKSON stated that he, WROTTEN, and WILLIAMS, along with the CI, would conduct the robbery. The UCA stated that s/he wanted to make sure that all members of the robbery crew saw the UCA and knew s/he was on the robbery crew's side as the UCA was half Puerto Rican and didn't want the robbery crew to mistake the UCA for a stash house guard. JACKSON explained to WROTTEN, "That's why he wanted to meet my guys, 'cause [the UCA] didn't want a

13

motherfucker thinking [the UCA] one of them and pop him." The UCA said, "if you have to dome them, you gotta do what you gotta do." JACKSON responded, "Exactly!" UCA reminded the men, "don't shoot me." WROTTEN advised, "We could come in that bitch with potato sacks and tie everybody's face up—they don't know nothing." JACKSON responded, "This shit like a 15 minute job—we gone." WROTTEN then told JACKSON, "When we take [the UCA} back in that's when we could give [the UCA a} little lick on the head, back of the head. [The UCA] fall down like [the UCA] got a concussion. Shit will work perfect like that." The UCA advised that the cocaine that was in the stash house was the best cocaine s/he had ever seen. The UCA suggested that the men be careful where they sell it and JACKSON told the UCA "Yeah, I gotta break it up."

39. The UCA asked JACKSON if he was ready to commit the robbery. JACKSON responded, "I'm ready, I got the bangers (guns) you know what I'm saying." Again, the UCA informed JACKSON that the UCA had not had any luck finding the police clothing for the robbery. WROTTEN advised, "I know where we could get some masks from." JACKSON then explained to WROTTEN that he and WILLIAMS wanted to use police clothing to throw off the stash house armed guards. Specifically, JACKSON stated "We were saying it would be really slick if we had some police uniform. Anything that look police. You know a nigga ain't gonna fire at no police." WROTTEN responded, "You can buy police gear. A lot of shit; fake badges, vests and shit. I can get on that shit today. All you got to do, get a chain with that fake badge, come in that bitch." JACKSON agreed saying "Freeze police! Put the lights on the end of the guns. Lights flashing in that bitch. Nigga's try to run away leaving them bricks (cocaine). They ain't running with them bricks (cocaine)." The UCA suggested that the police ruse might make the stash house guards hesitate. JACKSON explained, "Police would make any motherfucker's

got something to do with drugs hesitate." WROTTEN added, "Specially when I hit that corner with one of them big ass pumps (shotgun)!" The CI suggested that the crew was ready and JACKSON said, "We taking their ass down!"

40. At approximately 3:26 p.m., the UCA, the CI, JACKSON and WROTTEN exited the undercover vehicle and walked inside the restaurant. While there, JACKSON told the UCA, "Day you get that call I'm coming straight to where you at." After receiving their food orders, they exited the restaurant. Before leaving the parking lot, the UCA and the CI told JACKSON that they would contact him. JACKSON emphasized, "You call me I'm gonna come straight there."

41. After this meeting, the UCA had an opportunity to review an arrest photograph of WROTTEN. After viewing this photograph, the UCA positively identified the black male who exited Vehicle 2 as WROTTEN.

F. *July 28 and July 29 Phone Calls Between JACKSON and the UCA To Set Up the August 1 Robbery*

42. On July 28, at approximately 4:25 p.m., the UCA placed a consensually recorded telephone call to JACKSON at Phone 1. During the conversation, the UCA informed JACKSON that the cocaine supplier called and instructed UCA that the shipment would be ready for pick-up on Wednesday (July 31) or Thursday (August 1). The UCA asked JACKSON if these days would work for him for the robbery. JACKSON replied "Hell yeah, it looks good for me on those days, great." The UCA informed JACKSON that s/he was getting excited for the robbery to happen. JACKSON laughed and told the UCA, "Me too, man!" The UCA promised to contact JACKSON in the next day. The call then ended.

43. On July 29, at approximately 8:00 p.m., the UCA answered an incoming telephone call from JACKSON calling from Phone 1. This call was unrecorded. The UCA told

JACKSON, "I'll call you right back." JACKSON said "okay" and the call ended. The UCA then placed a consensually recorded return telephone call to Phone 1 at approximately 8:02 p.m.. During the conversation, JACKSON stated, "I'm doing good, bro. I'll be doing even better once we take care of that business." The UCA asked if the crew members were ready for the robbery and JACKSON responded "everybody good, everybody good." The UCA promised to call JACKSON the next day. The call then ended.

### G. The August 1 Attempted Robbery and Arrest of the Defendants

44.     On July 30 and July 31, JACKSON and the UCA exchanged phone calls. During these calls, which were consensually recorded, the UCA advised JACKSON that the pickup would take place on August 1 and to have his crew ready.

45.     On August 1, ATF agents set up surveillance at the location where the CI was to meet the defendants, as well as the location where the subjects were to meet the UCA. Prior to the CI's meeting with the defendants, agents searched the CI and his vehicle for weapons and contraband. That search did not locate any weapons or contraband. The CI's vehicle was also equipped with an audio and video recording device and a GPS tracker.

46.     At approximately 7:20 p.m., ATF agents observed Vehicle 2 arrive at the CI's location, which was a gas station on the corner of Roosevelt Road and Pulaski in Chicago. ATF agents observed JACKSON, WROTTEN, WILLIAMS, and an individual later identified as Nolan SWAIN inside of Vehicle 2. ATF agents then observed JACKSON and SWAIN exit Vehicle 2 and enter the CI's vehicle.

47.     According to the CI, while in the CI's vehicle, JACKSON informed the CI that his crew was not in possession of the guns, and that JACKSON was unaware that the robbery was to take place that day. The CI informed JACKSON that the robbery was imminent and that

JACKSON needed to procure guns. JACKSON instructed the CI to travel to the Englewood neighborhood of Chicago.

48.     ATF agents followed the CI's vehicle, and Vehicle 2 – occupied by WROTTEN and WILLIAMS – as it drove to the Englewood neighborhood. During the drive, ATF agents lost sight of Vehicle 2. The CI's vehicle finally stopped at a residence in the vicinity of 56th and South Ada Street, at which point the CI observed WROTTEN exit the residence and entered backseat of the CI's vehicle. The CI saw WROTTEN then removed a 9mm handgun from his waistband, place it on the backseat. WROTTEN exited the CI's vehicle and walked towards the residence.

49.     JACKSON directed the CI to travel to another location, which was a residence in the vicinity of 60th and Ada Street. The CI observed JACKSON exit the vehicle and enter the residence. CI observed JACKSON exit the residence a few minutes later and reenter the CI's vehicle. The CI observed JACKSON remove a 9mm handgun from his waistband and hand it to SWAIN. JACKSON instructed CI to travel to a gas station located on 71st Street and the Dan Ryan Expressway. ATF agents continued surveillance of CI's vehicle, following it to the gas station.

50.     ATF agents then observed the CI's vehicle, drive to a parking lot in the area of Roosevelt and Canal to meet the UCA. When the CI's vehicle arrived at the location, ATF agents also observed a gray Dodge Charger, occupied by WROTTEN and WILLIAMS, also arrive at that location.

51.     At the parking lot, the UCA told JACKSON, WROTTEN, WILLIAMS, and SWAIN, that s/he had a warehouse nearby where they could wait and prepare for the robbery. The UCA asked the men to follow him/her there. The UCA then drove to the warehouse,

followed by WILLIAMS and WROTTEN in Vehicle 3, and JACKSON, SWAIN, and the CI in the CI's vehicle.

52.     The warehouse was equipped with audio and video recording equipment, which captured the conversations and movements of the occupants in the warehouse.     According to the UCA, after s/he drove into the entrance of the warehouse s/he observed the CI vehicle and Vehicle 3 follow the UCA into the warehouse. The UCA saw JACKSON and SWAIN exit the CI's vehicle, and JACKSON told the UCA he was going to look for Individual A.[2] The UCA saw JACKSON and SWAIN leave the warehouse. Surveillance agents stationed in the area of the warehouse observed JACKSON and SWAIN walking northbound away from the warehouse. Inside the warehouse, the UCA saw WROTTEN and WILLIAMS exit Vehicle 3 and approach the UCA. The UCA, WROTTEN, and WILLIAMS proceeded to discuss the planned robbery, WROTTEN and WILLIAMS informed the UCA that "moves" (guns) were in the CI's vehicle. The UCA then went to the CI's vehicle and observed the guns on the backseat on the floor. Around this time, the UCA had a phone conversation with JACKSON who expressed concern that this robbery was "a police lick (set up)." The UCA also heard SWAIN in the background of the call stating, "this is a police lick (set up)." The UCA assured JACKSON that it was not a police action. JACKSON told the UCA that there appeared to be too many police in the area and that he wanted to go to a different location to plan for the robbery and would return to the warehouse to reunite with the UCA and others.

53.     After further conversations about the robbery among the WROTTEN and WILLIAMS, UCA gave the arrest signal and WROTTEN and WILLIAMS were taken into

---

2 Law enforcement also observed Individual A driving a beige minivan follow the UCA's vehicle, the CI's vehicle, and Vehicle 3 towards the warehouse.  However, Individual A was not observed driving into the warehouse.

custody. Shortly thereafter, JACKSON and SWAIN were arrested on the street near the warehouse.

54. ATF agents seized three handguns from the warehouse, from the backseat floor of the CI's vehicle, where they were left by SWAIN. Of the handguns recovered, one handgun was a Jimenez Arms, JA9, 9mm semi-automatic handgun, with serial number 117461. The second handgun was a Lorcin Engineering L9, 9mm semi-automatic handgun, with the serial number obliterated. The third handgun was a Smith and Wesson, SW9VE, 9mm semi-automatic handgun, with serial number RAL7448. ATF agents also seized Phone 1 from JACKSON.

*H. Defendants' Statements Inside of the ATF's Transport Van*

55. The defendants were placed in an ATF transport van and driven to ATF's office for processing. The transport van was equipped with audio and video recording equipment. According to law enforcement agents' review of the audio recording from the van, JACKSON stated, in substance, "they found three pipes (guns), can MACK (WILLIAMS) take the rap for three pipes (guns)? I can't." Based on my participation in this investigation, I believe JACKSON was referring to the three firearms were recovered from the CI's vehicle, after being placed there by JACKSON and SWAIN. In addition, according to law enforcement agents' review of the audio recording from the van, WILLIAMS stated, in substance, "The pipes (guns) have fingerprints on them...This wasn't looking right."

56. While being placed in the van for transport, SWAIN identified himself to law enforcement agents by name and date of birth.

*I. The Defendants' Post-Arrest Statements*

57. JACKSON waived his Miranda rights orally and in writing, and agreed to speak with law enforcement agents and provide a written statement. JACKSON admitted that he had

met with both the CI and the UCA and had planned a robbery with them. JACKSON also admitted recruiting WILLIAMS, WROTTEN, and SWAIN to commit the robbery. JACKSON confirmed that before the robbery was to occur, the defendants traveled to the Englewood neighborhood of Chicago to acquire firearms, and that he, WROTTEN, and SWAIN obtained guns, which were placed in the CI's vehicle.

58.　　WILLIAMS waived his Miranda rights orally and in writing, and agreed to speak with me and other agents and provide a written statement. WILLIAMS admitted that he agreed to be a part of the robbery from the beginning and knew that firearms would be used in the robbery. He further stated that he knew the robbery was for kilograms of cocaine from a stash house operated by the UCA's supplier. He further stated that JACKSON kept him up to date about the robbery plans and JACKSON's discussions with the UCA and the CI.

59.　　WROTTEN also waived his Miranda rights orally and in writing and agreed to speak with law enforcement agents. WROTTEN admitted he agreed to be part of the planned robbery and that he knew that the robbery was for kilograms of cocaine. WROTTEN further admitted that he knew firearms would be used in the robbery.

60.　　SWAIN also waived his Miranda rights orally and in writing and agreed to speak with law enforcement agents. SWAIN admitted that he was approached by JACKSON to perform an armed robbery of a cocaine stash house. SWAIN further admitted that he had handled the firearms recovered from the CI's vehicle.

## III.    CONCLUSION

61.    Based on the foregoing, your affiant submits that there is probable cause to believe that Thomas JACKSON, also known as "Tuck", Calvin WILLIAMS Jr., also known as "Mack", Demetrius WROTTEN, and Nolan SWAIN did conspire with each other and with others known and unknown, to knowingly and intentionally possess with intent to distribute a controlled substance, namely, five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1),  in violation of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

Eric Dornbusch
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

SUBSCRIBED AND SWORN
to before me on August 2, 2013.

ARLANDER KEYS
United States Magistrate Judge